## Richmond

AMERICAN OIL COMPANY v. J. W. DOYLE, ADMINISTRATOR OF
LEWIS HARVEY DOYLE, DECEASED.

January 16, 1936.*

Present, Campbell, C. J., and Holt, Gregory, Chinn and
Eggleston, JJ.

*Rehearing denied March 12, 1936.

The opinion states the case.

*Sinnott & May* and *V. P. Randolph, Jr.,* for the plaintiff in error.

*S. B. Campbell* and *G. P. Young,* for the defendant in error.

CHINN, J., delivered the opinion of the court.

This action was brought against American Oil Company, defendant in the court below, to recover damages for the death, by wrongful act, of Lewis Harvey Doyle, a child five years of age, resulting from an explosion of kerosene oil purchased for domestic use, which is alleged to have been negligently mixed with gasoline by the defendant, or its agents. The jury found a verdict in favor of the plaintiff for the sum of $2,500, upon which the trial court entered the judgment now before us for review.

The oil in question, purporting to be a gallon of pure kerosene, was purchased on the afternoon of Friday, October 24, 1933, by plaintiff's eldest son from the store of M. M. Price, who runs a filling station and a general store in the village of Ivanhoe, where plaintiff resides. The next afternoon between 1:30 and 2 o'clock Mrs. Doyle was in the kitchen of her home with her three small children. Adjoining the kitchen is a bedroom in which there is a large coal stove. Mr. Doyle had made a fire in the stove between 6:30 and 7 o'clock that morning, which he replenished before he left home about 9 o'clock to go hunting. While Mrs. Doyle was in the kitchen, Lewis Harvey went into the bedroom, and Mrs. Doyle testified that within a few minutes after he went out she heard a loud explosion in the bedroom "like a shot-gun went off."

Rushing into the room, Mrs. Doyle found the child's clothing on fire and immediately snatched him up to take him out of doors, but in her natural state of excitement and anxiety she did not notice conditions existing in the room. Her cries for help soon brought near-by neighbors who, on entering the room in which the explosion occurred, found burning oil scattered over the floor and on one of the beds. The stove door was open and oil was also burning on the outside of the stove from the bottom up to the door, and some ashes were on the floor. The force of the explosion was such as to slam the door leading from the bedroom into the hall, and blow out, saucer-shaped, the entire double seamed bottom of the can which had contained the oil. The can itself was lying out on the floor, and the bottom was discovered propped against the wall under one of the beds. The child was so severely burned that it died from its injuries a few hours after the accident.

No one having witnessed the actual occurrence, exactly what happened can only be inferred from the circumstances. It is the theory of both the plaintiff and the defendant that the child undertook to pour oil in or on the stove and in some way the fire or heat therefrom ignited the vapor arising from the liquid in the can which caused it to explode. Plaintiff's contention is that gasoline had been mixed with the kerosene, which lowered the flash point of the mixture to such an extent that it became a highly explosive substance.

It is testified that the night before some of the oil was poured from the can into the lamp used by the plaintiff which flared up to such an extent as to alarm Mr. and Mrs. Doyle, but after turning it down they allowed the lamp to burn for several hours, though it continued "to quiver and flutter." Mr. and Mrs. King, neighbors, bought some kerosene from Price the day before the child was burned and when they used it that night it flared up so much they threw the lamp out of doors. King said the lamp exploded before it struck the ground. F. V. Sayers, another

neighbor, bought some kerosene from Price; it had a yellow cast, and his lamp flared up to such an extent that he threw it out. Jane Woods, a colored woman, testified that her lamp blazed up so when she used oil obtained from the same source that she put it out, and returned the oil to the store.

After the accident Doyle saved the rest of the kerosene in the lamp and gave part of it to Walter Lawson, a filling station operator, who sent it to Richmond for a test, but it was reported that there was not enough of the oil to make one. Lawson testified that he tested some of the liquid with a flame and all that it did was to flare up. He denied he made a hydrometer test, but Doyle testified that he did make such a test in his presence and the specific gravity of the oil was 48.

It is testified that good safe kerosene has a flash point of 110 degrees or more. Gasoline fires at 60 degrees below zero, and has a specific gravity of 59 to 63. A relatively small mixture of gasoline will materially reduce the flash point of kerosene. If enough gasoline is added to kerosene to bring the specific gravity from 42 to 48 the flash point would be materially reduced.

Doyle produced at the trial a bottle containing the remainder of the kerosene he had saved from the lamp and it was exhibited to the jury. It is admitted to have had a yellowish cast somewhat similar in color to the Orange gasoline sold by American Oil Company, and that pure kerosene should be clear and almost white.

It is shown that the oil which caused the accident was sold to Price by R. V. Crowgey, of Wytheville, the defendant company's local distributor, who delivered kerosene and gasoline to dealers and filling stations from large storage tanks he kept for that purpose. The kerosene in question was received by the defendant company in Curtis Bay, Maryland, from tankers which pumped the oil into 80,000 gallon barrel tanks from which it was pumped into a tank car and shipped to Crowgey on September 12, 1933. It is shown that the oil was tested several times

before it was shipped, and this particular oil was tested to have flash point of 140 degrees, color 25, specific gravity 42.8, which conformed to standard good kerosene.

A tank car containing 8,249 gallons was received by Crowgey on September 15, and put into a volume tank which already had 79 gallons in it. This was sold off and delivered from time to time by tank wagons. The evidence shows that deliveries were made to M. M. Price on October 4, October 11, October 14, October 20, and October 24, of both gasoline and kerosene. On October 4, Crowgey delivered Price 105 gallons of gasoline, and 55 gallons of kerosene; on October 11, 95 gallons of American Orange gasoline; on October 14, 60 gallons of kerosene; on October 20, 43 gallons of Amoco and 35 gallons of American Orange gasoline; and on October 24, the day prior to the accident, he delivered Price 105 gallons of American Orange gasoline, and 109 gallons of kerosene.

The tank wagon used in making these deliveries had 5 tanks. The front tank had a capacity of 307 gallons, the middle tank a capacity of 204 gallons, the rear tank a capacity of 105 gallons, and there was a tank on each side with a capacity of 30 gallons each. It is shown that on October 24, the gasoline was run into Price's tanks from the tank wagon through a hose, but the kerosene was "bailed out" in buckets, then poured into his kerosene tank. It is testified by the tank wagon driver that on October 24, the front and rear tanks contained gasoline, and the middle and side tanks contained kerosene, but that in filling these tanks with kerosene and gasoline for distribution among Crowgey's customers the tanks were used interchangeably, as were the bailing buckets. In making deliveries to the filling stations, the oil or gas is "bailed in" from the tank wagon unless a full tank is sold at the time, when it is run in by a hose.

It was conceded in the lower court, and it is also conceded in the petition, that there is sufficient evidence to warrant the jury in finding that the oil in question was mixed with some other substance, and not pure kerosene,

but it is contended that the evidence fails to show that the defendant was responsible for the adulteration because there is no direct proof that it did not occur after it came into Price's possession. The evidence shows, as stated, that the tank car of kerosene which was tested at Curtis Bay, Maryland, and shipped to Crowgey on September 12, 1933, was in the exclusive control of the defendant or its agents from the time it was shipped until it was placed by Crowgey in the tank at Price's store. It is testified by two of Price's clerks that the oil sold and delivered to the Doyles was delivered to Price by Crowgey.

It also appears, as stated, that the kerosene and gasoline was used interchangeably in the tanks on Crowgey's delivery wagon; that the kerosene delivered to Price was bailed out and placed in his tank by buckets. It is, therefore, entirely possible that a small quantity of gasoline, in spite of the exercise of caution on the part of Crowgey's drivers, might easily have been left in one of these tanks, and in that way have gotten into the kerosene, or might have become mixed with the kerosene in the bailing process when it was delivered to Price. The evidence further shows that the delivery of the gasoline and oil in the tank wagon on October 24, did not check out exactly with the sales, but three gallons more of gasoline were sold that day than had been measured into the delivery truck. While, however, it does not affirmatively appear how the kerosene purchased by the plaintiff became mixed with gasoline or other explosive substance, since it is conceded that it was adulterated, considering all the facts and circumstances, we think the evidence sufficient to justify the jury in inferring that the admixture occurred in some way in the handling of the two products while the kerosene was in Crowgey's possession and the defendant is, therefore, responsible for the accident resulting from it.

But however that may be, it appears from the record that in making a motion to strike both at the conclusion of plaintiff's evidence and at the conclusion of all

the evidence, counsel for the defendant admitted "that there has been sufficient evidence of primary negligence to otherwise take the case to the jury, if it was not the question of proximate cause involved." It, therefore, seems that the defendant waived in the trial court all question as to the adulteration of the kerosene, and as to the defendant's responsibility therefor; and it further appears that the trial court, in passing upon the said motions, placed that interpretation upon counsel's statement without contradiction or protest on his part. The defendant having taken this position in the court below cannot now claim that the evidence of the defendant's responsibility for the adulteration of the kerosene was insufficient to support the verdict of the jury as to that point.

It is next contended that even though the evidence is sufficient to show negligence on the part of the defendant, there is no evidence to show that such negligence was the proximate cause of the death of the child, and the defendant cites numerous authorities to sustain the familiar rule that in an action for recovery of damages for an act of negligence there can be no recovery unless it is shown that the negligence of the defendant contributed proximately to causing the damage. In other words, it is contended that if the oil in the can would have exploded and caused the injury if there had been no gasoline mixed with it, the defendant's negligence in mixing gasoline with the oil cannot be held as the proximate cause of the result. It is true that where an injury results from two combined causes, one negligent, and the other non-negligent or purely accidental, the law places no liability on the person responsible for the negligent cause when the non-negligent cause would have alone been sufficient to bring about the injury, if the negligent cause had been absent. *Appalachian Power Co.* v. *Wilson,* 142 Va. 468, 129 S. E. 277; *Etheridge* v. *Norfolk Southern R. Co.,* 143 Va. 789, 129 S. E. 680.

In the instant case the jury were instructed for the

plaintiff, that if they believed from the evidence that the American Oil Company negligently delivered the mixture of gasoline and oil to Price's store, and that Doyle bought some of this mixture, and that the mixture exploded causing the death of Lewis Doyle, and "that if the substance had been kerosene the explosion would not have occurred, then the jury will find a verdict for the plaintiff."

The jury were also instructed for the defendant that it was necessary for the plaintiff to establish by a preponderance of the evidence "the negligence of the defendant in marketing, preserving or distributing an improper product, and that the negligence was a proximate cause of the death complained of." The jury were further told that if upon the evidence as a whole they were unable to say what was the cause of the accident they must find for the defendant, and that no verdict could be "based in this case upon speculation, surmise, conjecture or sympathy, but should be based solely upon the evidence in the case and the instructions of the court."

Defendant's instruction No. 3 informed the jury "that the term 'proximate cause,' as used in the instructions, means the cause without which the death complained of would not have occurred, and that even if they should believe that the defendant was negligent in marketing his product, nevertheless, if they also believed the death would have occurred if pure kerosene oil had been used by the deceased they must find in favor of the defendant, the burden of proof being upon the plaintiff to show by a preponderance of the evidence that the explosion complained of would not have occurred if the product sold had been pure kerosene oil."

It is testified by a number of witnesses that kerosene was commonly used in kindling fires, and that kerosene might be poured on a fire even when blazing without fear of an explosion, but if the vapor arising from gasoline comes in contact with a coal of fire it will explode immediately.

It is testified by the neighbors who first arrived at the scene of the explosion, who took note of the conditions, that there was no fire showing on top of the coal in the stove, though there were some red coals down underneath, and flame was burning the oil on the outside. It is true it is testified by one witness for the defendant that a flame was showing above the coal in one place, but this is contradicted by other witnesses who testified that the coal was covered with ashes and burnt cinders, and when the doctor arrived, which was within half an hour after the explosion, the room had become so cold that the fire had to be rekindled in the stove.

It is testified by one of the defendant's witnesses that it was necessary to have a "spark" (manifestly meaning an electric spark) or flame in order to ignite kerosene, and that gasoline poured on hot coals would ignite. It was also admitted that even a two per cent mixture of gasoline in kerosene renders the mixture unfit for domestic purposes and extremely dangerous to use. Viewing this evidence along with that previously cited, in the light of the instructions given by the court, we cannot say that, as a matter of law, the jury was unwarranted in finding that the explosion would not have occurred if the oil purchased by the plaintiff had been pure kerosene, and that the negligence of the defendant was, therefore, the proximate cause of the child's death, or the cause without which it would not have occurred.

The jury were the sole judges of the credibility of the witnesses, and the weight of the testimony, they were fairly and fully instructed, and their verdict approved by the trial court. The judgment is, therefore, affirmed.

*Affirmed.*